GEORGE MELIES CO. v. MOTION PICTURE PATENTS CO. et al.

(Circuit Court of Appeals, Third Circuit.   October 30, 1912.)

No. 1,616.

1. SPECIFIC PERFORMANCE (§ 88*)—RIGHT TO RELIEF—GOOD FAITH OF COMPLAINANT.

A party is not entitled in equity to specific performance of a contract, where he has not only failed to perform terms and conditions which were essential parts of the consideration, and on which its continuance was expressly made to depend, but did not intend to do so when the contract was made, but procured its execution by fraudulently misrepresenting his intention.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 226; Dec. Dig. § 88.*]

2. SPECIFIC PERFORMANCE (§ 17*)—PERSONS ENTITLED TO ENFORCE—CONTRACT MADE BY ANOTHER.

A corporation, which owned certain patents and had granted licenses thereunder, afterward joined with another corporation, in settlement of litigation, in conveying all their patents to defendant, which was organized for the purpose, and which it was verbally agreed should issue new licenses to all licensees of the former owners in good standing. Held, that such agreement was not made for the benefit of a licensee, and that such licensee could not maintain a suit to enforce its specific performance against the claim of the original licensor that it had forfeited its license and was not in good standing.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 38–46; Dec. Dig. § 17.*

Persons entitled to enforce specific performance, see note to Lawyer v. Post, 47 C. C. A. 493.]

Appeal from the District Court of the United States for the District of New Jersey; Edward G. Bradford, Judge.

Suit by the George Melies Company against the Motion Picture Patents Company and the Edison Manufacturing Company. George Melies and Gaston Melies intervened. Decree for defendants (190 Fed. 859), and complainant appeals. Affirmed.

George Demming, of Philadelphia, Pa. (Robert W. Dunn, of Chicago, Ill., and Joseph W. Goodwin, of New York City, of counsel), for appellant.

White, White & Taulane, of Philadelphia, Pa. (Anson Beard, of New York City, of counsel), for appellees Melies.

Caldwell, Masslich & Reed, of New York City (J. H. Caldwell and Herbert K. Stockton, both of New York City, of counsel), for appellees Motion Picture Patents Co. and others.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

GRAY, Circuit Judge.   The George Melies Company, appellant and plaintiff below, is a corporation existing under the laws of the state of Illinois, and the Motion Picture Patents Company and the Edison Manufacturing Company, appellees and defendants below, are corpora-

tions organized and existing under the laws of the state of New Jersey. The material facts, as set forth in the bill of complaint and answer, and appearing from the evidence, are summarized as follows:

Prior to the 31st day of January, 1908, the defendant Edison Company was the owner of the entire right, title and interest in and to reissued letters patent of the United States, No. 12,037, dated September 30, 1902, and No. 12,192, dated January 12, 1904, appertaining to the motion picture art. Under these patents, the Edison Company had the exclusive right to manufacture, use and sell motion pictures covered by said patents. As owner of these two letters patent, the Edison Company entered into an agreement with Gaston Melies, of New York City, acting for himself and as attorney for George Melies, of Paris, France, under date of January 31, 1908, in which a license was granted to said Gaston and George Melies, subject to the covenants, conditions and stipulations contained in said agreement, to manufacture and use such number of cameras or apparatus embodying the invention of the reissued letters patent as might be necessary for the proper conduct of the licensees' business, and to manufacture, print, produce and sell positive motion pictures embodying said invention, and also to import and sell motion pictures manufactured by George Melies in Paris. A copy of this license agreement is annexed as an exhibit to the bill.

The license agreement provided, among other things, that the licensor might grant other licenses under said patents, not exceeding six in number, unless a greater number of such licenses was authorized by a plurality vote of the licensor and the licensees, on the basis of one vote for each 1,000 running feet of new subjects placed on sale by the licensee during the year preceding the taking of such vote. It also provided that the license thereby granted was personal to the said licensees, Gaston and George Melies. Prior to the date of the said license agreement with the said Melies Bros., similar agreements, containing the same conditions and stipulations, had been issued to six other licensees. The licensor, the Edison Company, was also itself a manufacturer and seller of the articles covered by the patent, and as appears by the evidence, the general business of manufacturing and selling the articles used in the moving picture art and covered by the Edison Company patents, was managed in the mutual interests of the said licensor and licensees at meetings periodically held by them for that purpose. As testified by the vice president of the Edison Company, the licensor and licensees constituted "one happy family." It is in evidence that this general business was so conducted under an understanding that neither the Edison Company nor the licensees should make trade agreements with any particular exchange or individual dealer, by which such exchange or dealer should have an advantage over others in the same business. The reasons for such an understanding are obvious. Dealers, other than those with whom agreements of the kind mentioned were made, would justly complain that they were being discriminated against, and the dissatisfaction thus created would tend to injure the general business of the licensor and licensees.

On June 19, 1908, a written agreement was entered into between Gaston Melies, acting for himself and on behalf of his brother George, of the city of Paris, party of the first part, and J. J. Lodge, of the city of Albany, New York, of the second part. This agreement sets forth that the Melies Bros. were in possession of certain licenses granted to them by the Edison Manufacturing Company of New Jersey, by which they were permitted to import certain articles pertaining to the moving pictures art, from Paris, and to manufacture and sell and rent, under certain conditions and limitations, other articles covered by the patents belonging to the said Edison Company. It was then agreed between the said Melies and the said Lodge that the latter might organize and promote a corporation, to be known as the George Melies Company, for the purpose of carrying on, improving and extending the business as now conducted by the said Melies Bros. in the United States, with ample and sufficient capital stock as shall enable said corporation to so carry on, improve and extend the said business, the said corporation to be formed under the laws of the state of Illinois. Said Melies agreed to permit the said Edison licenses to become the corporate property of the said George Melies Company, and to permit said company to carry on the business under all the benefits and conditions as set forth in said licenses during the life of the same, the said Melies to be known and appointed as president of the said company by the duly appointed board of directors of said company, when formed. That said Melies should have exclusive control of the mechanical production of all negative and positive films manufactured by said company, agreeing to apply to the best of his ability his experience and expert knowledge in the production of the same. It was further agreed that the names of the Melies Bros., as licensees in the Edison licenses thereinbefore referred to, should be canceled by the Edison Manufacturing Company, and the name of the George Melies Company substituted instead thereof as soon as possible after the signing of the final contract by all concerned and the legal formation of the proposed Melies Company; and the said Lodge agreed to form an incorporated company with the necessary capital as therein set forth. Afterwards, in July, 1908, the option under this agreement was extended so as to include Lincoln J. Carter, of Chicago, as a party with Mr. Lodge in the agreements.

On August 3, 1908, the formal and final agreement contemplated by the foregoing, between Mr. Carter and Mr. Lodge of the one part, and Gaston Melies and George Melies (the interveners in this case) of the other part, was entered into, in which Lodge and Carter obligated themselves to the formation of a corporation under the laws of Illinois, capitalized at $75,000, to be known as the George Melies Company, to carry on all the business theretofore carried on by George and Gaston Melies, as licensees of the Edison Company, and which provided for the procurement by the Melies Bros. of a substitution of the Illinois corporation, to be formed by the said Lodge and Carter, as licensee in the Edison licenses theretofore issued to the Melies Bros. and in other respects conforming to the option agreement of

June 19th. It was also agreed that Lodge and Carter should furnish at least "$25,000 as cash capital to operate and carry on the business of the said company." On August 1st, the Melies Company was incorporated and on August 14th, formal application in writing was made, on behalf of Gaston Melies and his brother, to the Edison Company, asking its consent to the transfer of the two licenses held by the Melies Bros. to the said corporation. Mr. Gaston Melies was subsequently advised by Frank L. Dyer, general counsel and vice president of the Edison Company, that a majority of the licensees had consented to substitute the George Melies Company as licensee in the licenses, instead of the Melies Bros., and that a new license agreement would be issued as soon as informed of the incorporation of the George Melies Company.

On September 18, 1908, an instrument in writing, signed by the Edison Company, Gaston Melies and George Melies, and the Melies Company, was executed, formally transferring or re-issuing to the Melies Company the licenses theretofore granted to Gaston Melies and George Melies. Simultaneously with such transfer, an instrument in the form of a letter, addressed to J. J. Lodge, vice president of the George Melies Company, embodying certain additional restrictions upon the Melies Company, was drawn up in the office of the Edison Company, by the direction of Mr. Dyer, as vice president, and was accepted in writing by Mr. Lodge, as vice president of the Melies Company. This agreement, made coincidentally with the instruments of transfer of the licenses, is as follows:

Legal Department.

Thomas A. Edison.                                    Telephone 907 Orange.
        Cable Address, "Edlegal, Orange."
National Phonograph Co.                              Frank L. Dyer,
                                                        General Counsel.

Edison Business Phonograph Co.
Edison Manufacturing Co.
Bates Manufacturing Co.
Edison Storage Battery Co.
Edison Portland Cement Co.
                                                    Orange, N. J., Sept. 18, 1908.
J. J. Lodge, Esq., Chicago, Illinois.

Dear Sir: The Edison Manufacturing Company agrees to and does transfer to the George Melies Company, a corporation of Illinois, the license dated January 31, 1908, granted to George Melies of Paris, France, and Gaston Melies of New York City, under reissued letters patent No. 12,037 and No. 12,192, only under the condition (accepted by the directors of the George Melies Company) that the said license as to the George Melies Company, shall terminate, if, at any time during its life, the control of said company shall pass from Lincoln J. Carter, of Chicago, and yourself or either of you, or such successors as may be accepted in writing by said Gaston Melies or George Melies, or (in the event of the death or incapacity of both of them) Paul Melies, or if Gaston Melies, for any reason, should cease to be the president and a director of the George Melies Company, and not be succeeded in such offices by his son, Paul Melies, as provided in paragraphs 1 and 5 of a certain agreement entered into by and between George and Gaston Melies, J. J. Lodge and L. J. Carter, on the 3d day of August, 1908.

        Yours very truly,                         Frank L. Dyer,
GDS/MJL.                            Vice President Edison Manufacturing Company.

The above named license is accepted by the George Melies Company under the conditions expressed above.                        J. J. Lodge,
                                        Vice President George Melies Company.

It is admitted on both sides that, though the instrument transferring the licenses to the Melies Company was dated November 2, 1908, the true date thereof was September 18, 1908, as shown by the date of the above coincident letter of that date. It is not denied that this letter must be read into the agreement of transfer and license, as part thereof, and that the license to the Melies Company was issued and taken under the conditions and limitations therein contained.

In the agreement of August 3, 1908, between the Melies Bros. and Lodge and Carter, above referred to, providing for the transfer of the Edison licenses to the corporation thereafter to be formed, paragraph 8 is as follows:

"8. It is further agreed by both parties that at no time shall any person, or persons, firms or corporations, engaged in the manufacture or sale of films for moving pictures be allowed or permitted to hold stock in said corporation in so far as it lies in the power of the parties hereto to prevent the same."

The inference cannot be avoided from this and other evidence, that by this provision Lodge and Carter, for themselves and for the new corporation which they were to control, agreed that the understanding subsisting between the licensor and the licensees, heretofore referred to, that neither the Edison Company nor the licensees should make trade agreements with any particular exchange or individual dealer, by which such exchange or dealer should have an advantage over others in marketing the product of any manufacturer, was meant to be protected and its obligation imposed upon the parties to the agreement. And there can be no doubt from the testimony of Dyer, vice president of the Edison Company, and that of George Melies, as well as of Lodge himself, that it was perfectly understood that the licenses taken over by the George Melies Company, which Lodge was promoting, were taken over with all the restrictions, limitations, conditions and understandings that obtained between the Edison Company and its original licensees. In this respect, the Melies Bros. were acting as required by good faith on their part to the Edison Company; and it is apparent from the concluding sentence of the letter of September 18th, above quoted, that Dyer, in giving the consent of the Edison Company to the transfer of the license to the George Melies Company, was familiar with the agreement between Melies and Lodge, of August 3, 1908, above referred to, including paragraph 8, which we have quoted.

It appears from the evidence that about September 10, 1908, and pending the preparation of the papers necessary to transfer the licenses, Mr. Dyer received a telegram from William N. Selig, president of the Selig Polyscope Company, and George K. Spoor, president of the Essanay Film Company, of Chicago (each of which companies was an Edison licensee under agreements similar to that between the Edison Company and the Melies Bros.), protesting against the sale of the stock of the George Melies Company to persons engaged in the exchange or film renting business. (These protesting licensees had not joined in the assent given by the majority of the licensees to the transfer of the Melies license to the new George Melies

Company.) Mr. Dyer at once called the attention of Mr. Melies to this telegram, and the latter stated that he knew nothing whatever about it. At Mr. Dyer's suggestion, Melies wired for either Carter or Lodge to come on from Chicago, Lodge being the vice president and Carter the secretary of the George Melies Company, which they together had promoted and organized. Mr. Lodge came at once in response to the telegram, with Mr. Gaston Melies, and called on Mr. Dyer, who exhibited to Lodge a circular purporting to be sent out by the George Melies Company to persons engaged in the exchange or rental business, soliciting subscriptions to the capital stock of the George Melies Company. Against this, Mr. Dyer protested and told Mr. Lodge that the Edison licensees objected to rental exchanges becoming interested in the manufacturing business, and that they all considered it inadvisable for a manufacturer to be interested in a rental exchange. Mr. Lodge stated that the circulars were sent out by him without knowledge that they would be objected to, and that he would do all that he could to recall them, stating that only a few subscriptions to the stock of the Melies Company had been received, the amount thereof being $700, and that they should, if possible, be canceled. He admitted that the circulars had been sent to various film rental exchanges, and promised Mr. Dyer that he would not accept any further subscriptions to the stock, and would endeavor to cancel those few that had already been accepted. As to this interview between Lodge and Dyer, not only Mr. Dyer testified but also George Melies, who of course understood how objectionable such transfers of stock were, both to the Edison Company and the board of licensees, and had inserted a prohibition of the same in his contract of August 3, 1908, with Lodge and Carter.

It is perfectly fair to assume, after reading this evidence, that on the faith of these promises by Lodge, the transfer agreement of September 18, 1908, with the supplemental conditions contained in the letter of even date, was executed by Dyer for the Edison Company.

For some time prior to September 18, 1908, the Edison Company had been engaged in litigation with the American Mutoscope & Biograph Company. To settle this extensive litigation, the Edison Company and the American Mutoscope & Biograph Company decided to form and promote a company, to be called the Motion Picture Patents Company, to which the patents belonging to each of the two companies should be transferred, and while there was no special agreement, there seems to have been an understanding, that new licenses should be issued by the Patents Company to such of the licensees of the Edison Company as were in good standing, and not in default to the said company, and to certain licensees of the American Mutoscope & Biograph Company. Pursuant to this plan, the Patents Company was organized in November, 1908, and the patents of the Edison Company and of the American Mutoscope & Biograph Company were transferred to the Patents Company.

In consequence of these transfers to the Patents Company, on December 18, 1908, a meeting was called in New York, of the manufacturing licensees with the representatives of the Patents Company and

of the Edison Company, in order that the Edison licensees might apply for licenses from the Patents Company. The complainant was represented by Lodge, the Film Company by Spoor, and the Selig Company by Selig, the other Edison Company licensees having also representatives at the meeting. Soon after the meeting convened, Spoor and Selig told Mr. Dyer that they were informed that Lodge and Carter had sold the stock control of complainant company to Max Lewis, who conducted an independent exchange for buying, selling and renting moving pictures, and who also dealt in unlicensed films; that they had pooled the stock of the company under a trust agreement for a term of six years, and that they (Spoor and Selig) objected to the sale to Lewis, and objected to Lewis personally, on the ground that he was unfit to be a licensee, which he would practically be if he controlled complainant company and if a Patents Company license was issued to it. Dyer then called Lodge and Selig and Spoor into another room and informed Lodge what Selig and Spoor had said. The testimony as to these interviews between Lodge and Dyer on this and other occasions, is voluminous, but its perusal is thoroughly convincing that Lodge did not attempt, or at least not successfully, to deny the charge made by Selig and Spoor that he had sold a large block of stock to Max Lewis, the president of a film exchange and a dealer in rentals. It also appears that at this first interview, Dyer said to Mr. Lodge that complainant had imposed on the Edison Company, and had not complied with the conditions under which the Edison Company license was assigned to complainant, had violated its promise that none of the complainant's stock would be sold to any one interested in the exchange business, that the pool or voting trust of the stock was a breach of trust or faith on complainant's part, and was a breach of the license assignment agreement of September 18, 1908; that the Patents Company would not grant a license to complainant, and would only grant a license to such of the Edison Company licensees as were in good standing.

After the return of Dyer, Selig, Spoor and Lodge to the meeting, the provisions of the proposed Patents Company license were then discussed. Mr. Dyer proposed the meeting be adjourned to the next day, but some one suggested that the licenses be signed that evening and submitted to the directors of the Patents Company for ratification (it appearing that it was requisite that all the licensees should signify their assent by signing the new licenses to be issued by the Patents Company). Mr. Dyer stated that he had no objection to the proposed licenses being signed, on the understanding that they would not be binding until the directors of the Patents Company had ratified them. The meeting was finally adjourned until the next day, at the office of the Patents Company, at Orange, N. J. All the Edison Company licensees attended the adjourned meeting, except complainant. The directors of the Patents Company resolved that the Patents Company would not grant the application of complainant for a license, but approved the applications of the other Edison Company licensees, and Patents Company licenses were issued to them about January 1, 1909. The secretary of the Patents Company took the licenses which had

been signed on December 18th. to the office of the Patents Company, at Orange, and on December 19th, signed, as secretary, all the proposed licenses, including that to complainant, and placed the company's seal on them. Dyer telephoned the secretary not to sign and seal the proposed license to complainant, but he had already done so. The Patents Company did not deliver the proposed license to complainant. On the contrary, the complainant was eliminated from the list of licensed manufacturers, and the licensed exchanges were notified of this fact.

It afterwards transpired, as shown by the evidence, and especially by the testimony of Mr. Lodge himself, that at the very time, September 18, 1908, when it was agreed to transfer the Edison licenses to the new Melies Company, organized by said Lodge, in reliance upon Lodge's statement in regard to the transfer of stock that had been reported to Mr. Dyer, and of his promise that no more should be transferred, and what was already transferred, if possible, recalled, he, Lodge, had been and was then in a deal with Max Lewis for the sale to him of 350 shares out of 750 authorized by the Melies Company, and a few days after September 18th and the signing of the papers on that day, he, Lodge, consummated this deal and afterwards obtained from him, in December, $35,000 in payment thereof.

It will be remembered that, in Lodge's proposal to Gaston Melies, to organize and promote a company to take over from the Melies Bros. the Edison licenses, it was suggested and afterwards agreed that there should be a capitalization of the company of $75,000, and that he, Lodge, would furnish immediately $25,000 cash capital to start the operations of the company. It is evident from all the testimony that in this the Melies Bros. were imposed upon, and that Lodge was acting as a speculative promoter, without means, and that he did not expect to advance any money of his own, but to raise it by such sales of the stock as he negotiated with Max Lewis, the president of a film exchange controlling a string of such exchanges across the country, in direct violation, not only of his understanding with Mr. Dyer on September 18th. but of paragraph 8 of his written and final contract with the Melies Company, of August 3, 1908, above referred to. It also appears by the evidence that Lodge and Carter, early in November, 1908, caused complainant's entire capital stock of $75,000 to be issued to themselves, in exchange for the assignment of the Edison license to the complainant company, so that the stock they sold to Max Lewis, or others, they got for nothing, without paying a dollar of their own into the treasury of the company. This transaction with Lewis, as we have shown, was known neither to Dyer or other representative of the Edison Company, nor to the Melies Bros., until the meeting on December 18th, called for the purpose of arranging for the issue of new licenses by the Patents Company to the Edison licensees, to which we have already referred.

It also appears from the evidence that after the transfer of these 350 shares to Max Lewis, and before the meeting on December 18th, an arrangement had been made by Lodge, Carter and Lewis, by which the stock transferred to Mr. Lewis and that remaining in the hands

·of Carter and Lodge, was held by trustees ih Chicago. This trust appears to have been a voting trust, to continue for six years, and as such manifestly took from Lodge and Carter the control of the Melies. Company during that period. All of these transactions in regard to the sale of the stock to Lewis, and the formation of the voting trust, were unknown to the Edison Company until the meeting of December 18, 1908, above referred to, and their disclosure at that meeting was the occasion of the declaration by Mr. Dyer, representing the Edison Company, that this violation of the agreement of September 18th, by Lodge and the Melies Company, terminated ipso facto the license agreement of that date. Though executed and sealed with other licenses to the former Edison licensees, the delivery thereof was refused by the Patents Company, on the ground that the complainant was not a licensee in good standing with the Edison Company, and that the Patents Company was under no obligation, contractual or otherwise, to the complainant, to issue its license to it under the circumstances above recited.

Thereafter, on May 21, 1909, the complainant, the George Melies Company, filed its bill of complaint in the court below, alleging that the conduct of the defendants in the premises was contrary to equity and good conscience, and prayed for equitable relief, as follows: That the defendant, Motion Picture Patents Company, be ordered and decreed to produce in court a license agreement by its vice president, J. J. Lodge, and delivered by said Lodge to said Motion Picture Patents Company; that if said license agreement had not already been signed and sealed on behalf of said Motion Picture Patents Company, the said Company be ordered and decreed to sign and seal the same, and be further ordered and decreed to deliver the said license agreement, so signed and sealed, to complainant; that in default thereof, said license agreement be declared in full force and effect, and that complainant be declared to be subject to all the obligations and entitled to all the rights and privileges of said license agreement, according to the terms and tenor thereof; that defendant, Motion Picture Patents Company, its officers, agents, etc., be enjoined and restrained from directly or indirectly prohibiting or preventing its other licensees and license exchanges from purchasing motion pictures or other products or materials from the complainant, and from directly or indirectly depriving complainant of a market for its motion pictures, materials and products; that complainant may have such other or further relief in the premises against the defendant, Motion Picture Patents Company, or the defendant Edison Manufacturing Company, or both, as may seem just and equitable.

By their intervening petition, filed October 23, 1909, George Melies and Gaston Melies were admitted as interveners, and in their petition made answer to the allegations of the bill of complaint, and to said intervening petition the complainant afterwards made answer. After replication and issue and the taking of testimony, the case came on for hearing in the court below, and after argument by counsel for the respective parties and consideration by the court, the bill of complaint and plea of intervention were dismissed.

[1] After careful consideration of the pleadings in the case and the evidence as disclosed by the voluminous record, we have no difficulty in sustaining the action of the learned judge, who, as chancellor, refused the equitable relief sought for by the complainant. Referring to the supplementary agreement contained in the letter of September 18th, from Dyer to Lodge, which we have heretofore quoted at length, it appears that the license agreement between the Edison Company and the Melies Company was absolutely to terminate, if, at any time during its life the control of said company passed from Carter and Lodge, or if George Melies for any reason ceased to be a president or director of the company. The evidence clearly establishes the fact that, without the knowledge or consent of the Edison Company, control of the Melies corporation passed from Lodge and Carter, first to one Max Lewis and afterwards to a voting trust. This is not a suit for forfeiture or rescission of a contract, for condition broken, but an attempt to invoke the equitable powers of a chancellor to compel the recognition and performance of a contract by defendants, who assert that it has been terminated and is non-existent. Unquestionably, such a defense was available to these defendants without first resorting to judicial procedure for the forfeiture or rescission of the license contract.

Not only so, but the equitable relief sought by the complainant was properly refused by the chancellor, on the ground of the false and fraudulent representations made by Lodge on behalf of the complainant to the Edison Company, immediately before the execution of the collateral agreement of September 18th, above referred to, and upon the faith of which we may presume that said agreement was executed by the said Edison Company. These representations were not merely promises as to future conduct, possibly made in good faith and afterwards broken, but as the evidence shows, were promises which must have been made with the intention of not keeping them, or with full knowledge that they would not or could not be kept. It will be recollected that at the very time Lodge promised, on September 18th, that no stock would thereafter be issued or sold to exchanges or those directly or indirectly interested therein, he was negotiating with Max Lewis for the sale and delivery to him of 350 shares of said stock, which sale was thereafter consummated. This evidence convicts Lodge of making promises on behalf of the complainant, with the then present intention of violating them, so that conduct induced by these promises was induced by a false representation as to an existing fact; i. e., his intention in regard to the issue and sale of stock.

Whatever might have been the effect of this conduct in a suit for rescission of the license contract, there can be no doubt that it might properly influence the judicial discretion of the chancellor in denying the equitable relief of specific performance, on the ground that the complainant had not come into court with clean hands. Nor does it matter that the defendant has not pleaded this as a specific defense, if the facts stated by the defendant in his answer and appearing in the evidence justify such a finding.

[2] It is also to be noted that the defendant, against whom a decree for a specific performance is prayed, is the Patents Company, which was under no contractual relation with the complainant, having had a merely verbal understanding with the other defendant, the Edison Manufacturing Company, that it, the Patents Company, would issue licenses to such of the licensees of the Edison Manufacturing Company as were in good standing and were not in default in any of the terms and conditions of the license agreement theretofore made with the Edison Company, or whose licenses were in full force and effect. We do not think that this was such a contract as was made for the benefit of the complainant, and therefore entitling it to the decree prayed for. The Patents Company had no contract with the licensees of the Edison Company, but had merely consented to issue its license to such of them as the Edison Company should point out as in good standing and not in default in their agreements with that company. We think the court below was clearly right in the exercise of its judicial discretion, when it refused the relief sought by the complainant.

The decree below is therefore affirmed.